FILED
IN CLERKS OFFICE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

2021 AUG 11  PM 5: 04

U.S. DISTRICT COURT
DISTRICT OF MASS.

**SUFFOLK, ss.**

**SUPERIOR COURT**
**CIVIL ACTION NO.**

21-cv-11263-IT

USMS SCREENED

|  |  |
|---|---|
| **LORRAINE TROWERS-BELL,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| **CHILDREN'S SERVICES OF ROXBURY/Sandra McCroom JOAN SINNER NATASHA HALL CARLINE LEON** | ) |
| **Defendants.** | ) |

### COMPLAINT AND DEMAND FOR BENCH TRIAL

This is a civil action for damages sustained by former Director of Scattered Sites Emergency Shelter at Children's Services of Roxbury Lorraine Trowers-Bell.

### THE PARTIES

1. The Plaintiff, Lorraine Trowers-Bell ("Lorraine") is an individual residing in Boston, Massachusetts.

2. The Defendant, The Children's Services of Roxbury ("CSR") is a Massachusetts corporation with a principal place of business located at 520 Dudley Street, Boston, Massachusetts.

3. The Defendant, Sandra McCroom ("Sandra") President and Chief Executive Officer is mentioned by default, is an individual residing in Boston, Massachusetts.

4. The Defendant, Joan Sinner ("Joan") Vice President of Housing & Stabilization at CSR, is an individual residing in Boston, Massachusetts.

1

5.  The Defendant, Natasha Hall ("Natasha") Director of Human Resources at CSR, is an individual residing in Boston, Massachusetts.

6.  The Defendant, Carline Leon ("Carline") Housing & Stabilization Program Manager at CSR, is an individual residing in Boston, Massachusetts.

## JURISDICTION AND VENUE

7.  Jurisdiction is properly conferred by G.L. c. 212, § 4 and c. 223A, §§ 2 and 3. 21.

8.  Venue is proper under G.L. c. 223, § 1.

## STATEMENT OF FACTS

### There is Proof my Work Performance Remained up to Standard

9.  Although it is presumed CSR is an At-Will Employer, my complaint and relief qualify under two Common Law assumptions: **Implied Covenant of Good Faith and Implied Contract**.

10. Although MA does not recognize the **Implied Contract** exception, it is applied broadly and worth mentioning here where CSR employees are at-will the agency has an employee handbook that fosters the belief that they will only be terminated for "just cause" which is supported by use of the agency's corrective action plan in place.

11. CSR and Department of Housing and Community Development (DHCD) employees as well as shelter families can attest that under my strategic impactful leadership, I increased permanent housing placements that improved the reputation of CSR; emergency shelter governed by DHCD.

12. Since my departure, Joan has updated my job description.  However, my personnel file no longer has my job description included.  Therefore, I would like to request the original Director of Scattered Site job description as it was (unrevised version) when I was hired. This version of my job description states that shelter Providers that oversee DHCD

2

Emergency Shelters must equally report to their contractor (DHCD) as well as CSR. **Please see past job descriptions with DHCD duties included.**

13. CSR currently has in place a corrective action (write-up system) performance improvement plans (PIP), however, I confirmed that my current employee record has no verbal nor written corrective action plan. CSR personnel file had no existing complaints or warnings regarding my work performance. In, **Lopes v. Hubbell Inc., 2012 WL 1292601 (Conn. Super. March 23, 2012) (Ozalis, J.).** this case supports an employer not deviating from a system (of terminating employees) that is currently has in place. If CSR typically fires employees based on verbal, written warnings as well as performance improvement plans, then this time should be no different. This factfinder should find Natasha and Joan's actions negligent and reckless and should not support a same day "on the spot" termination of a leader of a department whose personnel file was without blemish had no verbal nor written warnings.

14. However, the **Implied Covenant of Good Faith and Fair Dealing** exception is recognized in MA and usually says that in certain situations employers can only dismiss employees for just cause or that they cannot dismiss employees for reasons motivated by malice or made in bad faith. This exception applies to my case when. Joan's oppositional and vindictive behavior directly impeded upon my required communication with contracting agency-DHCD. Therefore, **Li v. Canberra Industries, 134 Conn. App. 448 (March 27, 2012) (Beach, J.). enforces** that a shelter Director's obligation to DHCD and precludes the withholding of serious incidents that occur in a DHCD emergency shelter.

15. This also, is a public policy issue as a family could not exercise their civil rights, if I pretend that a serious incident (that impacts them) never occurred.

16. Both (Scattered Site and Congregate) Directors are mandated to regularly report serious incidents (within 24 hours of its occurrence in our shelter) to DHCD. Along with submission of these serious incidents, DHCD also wanted shelter providers to supply police reports, pictures, and videos (when available) as supporting documentation. DHCD mandated and held each CSR staff accountable and liable to read and sign off on the requirement to identify, understand, and report every serious incident that occurred at CSR.

17. **INCIDENT:** In January to March 2021, this client submitted a request to manufacture marijuana in the unit without landlord knowledge. Ms. Sinner wanted me to approve client's request but once the notice was submitted, DHCD denied the request. Clients request to manufacture marijuana in the unit without landlord knowledge. Joan wanted me to approve client's request without submitting an official request to DHCD. However, I have a duty to submit all serious incidents to DHCD. Therefore, once I submitted this serious incident, it was denied by DHCD.

18. **INCIDENT:** On 1/12/2021, an unexplained and sudden death on 1/1/2021 within the client shelter unit where there was illicit drug use in the presence of a minor child. An unexplained and sudden death within the client shelter unit where there was illicit drug use in the presence of a minor child. Supervisor Joan tried to impede the rules of DHCD when she told me not obtain and submit the police reports to DHCD.

19. **INCIDENT:** On 3/2/2021, a client with a history of domestic violence disclosed her current housing location to her past abuser.

20. **INCIDENT:** On 3/10/2021, this family had a violent fight with their guests in their unit at 2:00AM which led to one of the guests being stabbed and transported to hospital. Clients had

4

a violent fight with their guests in their unit at 2am which led to one of the guests being stabbed and transported to hospital.

21. **INCIDENT:** On 4/13/2021, a domestic violence situation allowed her abuser to visit her scattered site unit in Mattapan at 5:00 AM and access the clients' weapon/gun. This family was previously transferred from our Co-shelter setting by CSR's Director of Congregate for a similar domestic violence incident by the same abuser. Joan did not seem to hold it against that Congregate Director when she notified DHCD about that client's prior domestic violence incident. This family placed CSR staff, other CSR shelter families, as well as the public at risk as she withheld and gave misleading statements to the Domestic Violence assessor (Avalon Meyers) situation allowed her abuser to visit her unit at 5am and access a gun the client had in her possession.

22. Therefore, the **Abbey v. Giffords, 2013 Conn. Super. LEXIS 1992 (September 6, 2013)** case reiterates the stark reality that contracting agencies expect staff that oversee their shelters to work with a level of integrity and transparency. DHCD expects Directors and staff interacting with their shelter families to be truthful in our statements and actions while in a professional capacity working under DHCD at CSR.

23. Joan questioned why the shelter families are to become stable and rehoused. Also, why we are working so hard during COVID to deter from following Department of Housing and Community Development-DHCD rules and regulations. **Please see DHCD rules and regulations attached**. I refused and they became hostile with me and my team.

24. Despite DHCD, CSR and Boston Housing Authority (BHA) requirement for CSR shelter staff to maintain and verify these client documents. However, Joan opposed and questioned the need for me and staff to request and verify these client documents.

25. For example: Joan stated to me that I was a lying conniving deceptive person who did not
care about families because a family called her upset and crying as they did not have the
desire to relocate to their hometown. In actuality, the family did not remember that they
submitted this request to return to Brockton. Joan dismissed the fact that as the Director it
was my job to communicate and coordinate to CSR families, transfers that were approved by
DHCD.

26. Upon move-in (to CSR shelter) a family completed a 20-mile form, which certified that the
family has opted to accept and return to a shelter placement closer to their hometown when
DHCD notifies them that the placement has becomes available. Based on DHCD protocol,
the family was contacted and notified of the approved request and that they were now
authorized to move back to an EA shelter in their hometown of Brockton, MA.

**Various CSR employees in my same situation were treated differently. They were not fired (for their actions), but are still CSR employees:**

27. Shari Gold: the CSR Director of Congregate also previously emailed DHCD regarding the
client (mentioned above who had the gun her unit) at the time she had a serious domestic
violence incident in her unit. Once this Director notified DHCD, they decided to transfer the
client to another EA shelter.

28. I presented Joan with proof that my staff L. Johnson was submitting fraudulent mileage
requests. Joan responded that the staff's actions did not warrant a corrective action (write up)
but although L. Johnson submitted multiple fraudulent requests, based on the dates (end of
Dec 2020 and beginning of Feb 2021) she only committed this fraud once in the year.

29. Additionally, I confirmed at least 4 other employees (WD, GD, CL, and RD) who complaints
were submitted by either, staff, clients, and partners for a myriad of issues.

30. In my termination letter Joan stated that the reason I was being terminated from CSR based on my "interactions have a negative impact on staff and families". Joan does not understand her role as a Vice President of Housing and Stabilization in an emergency shelter setting because this statement cannot be more far away from the truth. In my first year at CSR, I was able to re-house families who were living in CSR shelter for six years. During my tenure at CSR, not only did I equip my team to increase permanent housing placements. I also created systems and documents to make the re-housing process at CSR more efficient.

31. By Joan's own admission, she does not respect the process, nor does she understand the essence of housing homeless families.

32. **INCIDENT:** Joan asked for the reason "Boston Housing Authority" requested bank statements from our shelter families. Joan commented to me that she did not agree with the fact that Housing Authorities require applicants to submit financial documentation to fulfill housing requirements i.e., bank statements and paystubs. I advised Joan this standard requirement was used by the Department of Housing and Urban Development (HUD) which is authorized to collect this documentation to determine eligibility and need.

33. In the month on May 2021 (during the Pandemic, the same month that I was terminated), myself and my case management team were in the process of assisting our families to complete housing applications and submitting documentation for two major housing initiatives. The 1st was for the families impacted by domestic violence under the Victims Against Women Act (VAWA) and the 2nd was for families impacted long-term by chronic illness. About 60 of CSR's 120 families in scattered sites were able to submit applications to obtain suitable affordable housing for homeless families.

**Supervisor Joan targeted, mocked, and scrutinized my religious practices and beliefs:**

7

34. Joan and I were speaking about why I am always so happy and can see the positive side to things regardless of any adversity that I face.  I stated to her that God has not placed in me a spirit of fear but of love, power, and a sound mind.   I also stated to Joan that I have not seen the righteous forsaken, nor his seed begging bread.  Joan said that she did not believe in God, as she was an atheist.

35. In April 2021 for the month of Good Friday, Joan asked me "are you alright, it looks like you are shrinking, what is going on with your weight?"  I was embarrassed and ashamed that Joan questioned my weight as if I looked sickly.  I told Joan that I was fasting for Lent and her eyes widened (as if to say "sucks to be you") before she turned to walk away.

**Joan also made the following harassing, intimidating, bullying, statements that depressed and caused me stress:**

36. "What's your rush, to return to the office?"

37. "We do not have to answer to DHCD."

38. "Don't take into consideration CSR's liability, when we run (operate) our programs?"

39. Joan would provoke me when she addressed issues (publicly) that only she and I discussed.  The staff would be able to ascertain that she was referring to me as the issue was one addressed by Directors (either the only other Congregate Director would be absent, or she would refute the argument -so staff knew it was addressed only to the Scattered Sites Director).  This would urge me to address the issue while staff/leadership were present-so all staff always knew Joan and I were conflicted or incongruent.

40. Joan would publicly belittle me by citing things that did not go as planned for me.  She would state that this is an example that I should not strive for perfection.

41. At a leadership meeting, Joan stated that she liked when things went wrong for me as that proved to me that it is alright not to expect perfection.   Therefore, I should not realistically thrive for perfection.

**Joan humiliated me publicly when she assigned me to speak at the agency all staff assembly meeting in Worcester, MA.**

42. **INCIDENT:** Joan asked me to write a speech, then rewrote my entire speech and deleted my input.  I informed Joan that I dislike public speaking as I have a speech impediment disability of stuttering, so I asked that she please find someone else.  Although other CSR staff volunteered (Aaron Tavares) JS declined his offer.

43. Joan reiterated to me that this was a task given to me and I must do as I was told.  I almost passed out while standing in front of the crowd.  I began sweating, was dizzy, had blurred vision (things moved in slow motion).  I was stuttering and skipping words which made me incoherent, so others had to assist me and take over the speech.  I saw people whispering, laughing, and snickering.  That experience left me feeling like a failure, embarrassed, ashamed, and humiliated.

44. **INCIDENT:** I presented Joan with proof that one of my staff persons (L. Johnson) were (on more than one occasion) submitting fraudulent mileage statements, she advised that this was insignificant because the dates of theft was submitted at the beginning of the next year.

**Joan also forged and encouraged the underlying Harassment from colleague Carline L. who made unprofessional remarks to me (publicly: in the presence of my staff and leadership teams) about my leadership and work ethic.**

45. Joan fostered a hostile, toxic and stressful work environment when she allowed the HomeBASE and Stabilization Manager Carline Leon to make public contentious and

damaging statements to me in the presence of my peers that questioned my leadership skills and work ethic.

46. **INCIDENT:** While at a leadership team meeting, Ms. Leon stated to me that I did not properly/adequately advocate for CSR families, I use forceful tactics to move families out of shelter too soon.  Also, she stated that l allowed families not to view apartments before they sign their lease.   Joan Sinner neither addressed nor followed up with the meeting I requested to resolve this matter.  Joan Sinner may be contacted at jsinner@csrox.org and jmsinner@yahoo.com 617-851-7624.  Also, Carline Leon may be contacted at cleon@csrox.org and 617-669-7849.

47. **INCIDENT:** During the event surrounding Shantea Mac's emailed complaint, Carline stated to me that she believed that myself as well as I am aware that my team typically perform acts "not in the best interest" of CSR shelter families and we act of their behalf without the families' actual consent.

**I notified Joan that Carline generally makes disparaging combative statements to myself, CSR staff, CSR shelter families, as well as to CSR partners.**

48. Joan did nothing about my constant complaints about the hostility and harassing behavior.  She neither addressed this with me, nor Carline individually as well as never addressed the issue as a group to all staff.

49. CSR staff, Case and Placement Manager Jemina Simon has witnessed Ms. Sinner and Ms. Leon's statements and interactions with the staff and families.  Jemina Simon may be contacted at Jeminasimone@gmail.com and 781-600-1086.

50. During that meeting, I requested that we meet to discuss the issues Carline has with me and my scattered sites staff as well as the open negative statements she continues to make regarding our work ethic.   Joan never followed up with me to schedule a meeting nor to

address Carline's statements.  Admittedly, I did not follow up and attempt to schedule this
meeting as I was very fearful of the "trouble I would create for myself" and the lack of
support I would receive from Joan.

### Terminated Immediately Realtor Shantea Mac's Compliant was emailed to Director of HR

51. Joan and Natasha's Retaliatory termination after I emailed Realtor Shantea Mac complaint to
Natasha Director of Human Resources. **Please see Shantea Mac complaint attached**

52. Joan fostered a hostile, contentious work environment that directly caused me to be bullied
by colleague Carline Leon.  Joan and Natasha terminated me less than one month after I
forwarded Shantea Mac's email (attached 26-page email) that listed the complaints about
interactions she had primarily with Carline Leon HomeBASE and Stabilization Manager.  In
**Siani & Law v. University of Colorado the court found this termination to be
Retaliation** when the employees were fired soon after reporting the employer's wrongdoing.

53. **INCIDENT:** On 4/5/2021 Carline Leon copied me on a contentious email with Realtor
Shantea Mac.  I also forwarded this email to my supervisor for transparency and resolution.
Ms. Sinner neither addressed nor met with Carline and I regarding this email.  I also
forwarded this email chain to supervisor Joan to ensure she was aware of the impending
issue.  Joan did not response to this email, nor did she follow up regarding the result of this
email chain.

54. **INCIDENT:** On 4/12/2021 Realtor Shantea Mac emailed her concerns about CSR.  I
forwarded Mrs. Mac's email to my supervisor Joan who neither addressed, met with Carline
nor followed up with me regarding Shantea Mac's complaint email concerning CSR.

55. **INCIDENT:** On 4/15/2021 In order to alert Human Resources that CSR owed Mrs. Mac for services rendered, that CSR's reputation was at stake and time was of the essence before Realtor Shantea Mac went public with the damaging information against CSR.

56. Therefore, for several reasons, I believed that Joan may need assistance in this matter as in the past she demonstrated the inability to confront oppositional behavior between staff. Joan was with CSR for only two years. Also, my career and reputation were also at stake (as a leader in Housing & Stabilization) so I believed forwarding the email would give her support to handle the matter appropriately.

57. The **Abbey v. Giffords, 2013 Conn. Super. LEXIS 1992 (September 6, 2013)** case reiterates the stark reality that employers hire staff to work with a level of integrity and transparency. CSR expects me to be truthful in my statements and actions while in a professional capacity at CSR.

## Joan Created, Fostered, Hostile, Harassing work environment at CSR:

58. On Tuesday May 11, 2021, (in a single meeting), the following unlawful, unfair, and deceptive acts and or allegations occurred without any prior verbal nor written warnings noted on my work record. Also, without any gross misconduct threats or violence toward staff or families.

59. Both Supervisors Joan and Natasha Director of Human Resources (NH) retaliated when I was fired on the spot and caused a hostile work environment when she failed to resolve and follow up about outside partner's email complaint on CSR work practices. When I notified HR Director about these unlawful practices within the agency.

12

60. After being praised by DHCD and CSR for steadily increasing permanent housing placements for homeless families at CSR, I was fired on the spot; without any prior verbal nor written warnings noted on my work record.

61. The actions of Joan and Natasha were unethical, unfair, and deceptive as I was only given a verbal termination, never no documentation to confirm termination in writing. Joan met with my staff on the morning of May 12th to officially announce my voluntary departure and she communicated that I was "sick" (this was untrue, Joan fired me on 5/11) and unable to return to work. Joan also threatened my staff to refrain from any contact with me.

62. It has been brought to my attention that on May 12th (following my termination) that Mr. Agblekpe was suspended without pay. The above listed cases (except one) are managed by Case and Placement Manager Kodjo Agblekpe. He may have been targeted as he was the prime witness on these cases and always assisted with gathering concrete evidence that could be strengthening the cases to be transferred. **Kodjo Agblekpe be reached at agblekpe@gmail.com and 617-372-3084.**

63. Furthermore, they presented bogus one-sided arguments and referenced third party accusers to support they're that I was fired because I was unable to get along with CSR shelter families and staff. Meanwhile, I never had a chance to face my alleged accusers (CSR shelter families and staff) nor hear their specific statements/concerns and view evidence about my alleged intolerable actions.

64. Joan Sinner could offer no first-hand account of evidence of my alleged egregious behavior that warrant being fired on the spot with an employee file (w/o verbal or written warnings).

65. Joan and Natasha breached her professional duty of care to objectively review the complaint document that made allegations about and could threaten CSR's reputation. I was terminated

13

without any gross misconduct, threats or violence toward staff or families.  Natasha Hall may

be contacted at nhall@csrox.org and 617-331-6953.

66. Natasha and Joan used intimidation when they presented the following two options (with

only a few hours to decide by 5pm).  I could either resign voluntarily or receive a separation

of employment from Human Resource.  I was reassured that with either option CSR would

not contest unemployment.  However, based on my alleged "negative work history at CSR",

I could not be employed by the Police nor the Federal government.

67. Natasha and Joan left me with no choice but to contest this wrongful termination.  They

believed that I should end my career of housing homeless families with the degradation that I

was fired from CSR.  My human service work was in essence made possible in conjunction

the Police and the Federal government.

68. In **Hurley v. An Post 2017 IEHC 568-** "defined workplace bullying" Also, An Post, as Ms.

Hurley's employer, was found liable for the bullying and harassment which Ms. Hurley

experienced from her co-workers. The court found An Post had breached both its common

law duty of care to Ms. Hurley as an employee and its statutory duty under the Safety, Health

and Welfare at Work Act 2005. It noted that An Post had failed to address Ms. Hurley's

complaints in any meaningful way and noted that *"no efforts were made by management to

engage with her predicament other than by hoping that matters would improve over time."*

**HIPAA violation of medical privacy regarding not taking the vaccine.  They stated they
believed that I was not supportive of the company mission and vision:**

69. Supervisors Joan and Natasha also committed a HIPAA violation of medical privacy when I

did not take the COVID-19 vaccine.  When I did not take the vaccine, my supervisor

believed that I was not supporting the agency mission and vision.  Also, I believed that the

state of my health was being questioned and I was treated adversely because I was not

vaccinated at the time.

70. Essentially, I performed my job adequately when I promptly presented all COVID-19

information regularly at meetings with my staff which then equipped my case managers to

relay this information to their clients.

71. Joan wanted me to push/force families and staff to take and track who had been vaccinated.

It is not in my job description nor am I equipped with medical education/licenses required to

give medical advice to staff nor clients on matters related to health and medicine.

72. In **Lopes v. Hubbell Inc., 2012 WL 1292601 (Conn. Super. March 23, 2012) (Ozalis, J.).** a trial judge ruled in favor of the employee as the employer breached an implied (unwritten) contract when the employer had a policy of terminating employees' employment based on seniority but ignored the policy when it terminated the plaintiff. PAGE 2

73. In **Li v. Canberra Industries, 134 Conn. App. 448 (March 27, 2012) (Beach, J.).** an appellate court held that there was enough evidence, to go to trial when an employee (as directed by her boss) was terminated after she refused to make unethical phone calls to the company's competitors seeking information and pretending to be someone else. PAGE 3

74. In **Abbey v. Giffords, 2013 Conn. Super. LEXIS 1992 (September 6, 2013),** the court allowed the nanny to go forward with her wrongful termination claim that she was fired in contravention of an important public policy of the State of Connecticut, i.e., telling the truth in court. This came after she was fired for reporting to the employer's ex-husband and his lawyer that the employer intended to falsely accuse the ex-husband of sexually abusing their daughter. PAGE 3

75. In **Siani & Law v. University of Colorado** a court ruled there was retaliation when the employees were fired soon after reporting the employer's wrongdoing (improper disposal of its hazardous waste) and was awarded $600,000 at trial. PAGE 6

76. Supra **Abbey v. Giffords, 2013 Conn. Super. LEXIS 1992 (September 6, 2013)** PAGE 7

77. In **Hurley v. An Post 2017 IEHC 568-** "defined workplace bullying" Also, An Post, as Ms. Hurley's employer, was found liable for the bullying and harassment which Ms. Hurley experienced from her co-workers. The court found An Post had breached both its common law duty of care to Ms. Hurley as an employee and its statutory duty under the Safety, Health and Welfare at Work Act 2005. It noted that An Post had failed to address Ms. Hurley's complaints in any meaningful way and noted that *"no efforts were made by management to engage with her predicament other than by hoping that matters would improve over time."* PAGE 8

## STATEMENT OF CLAIMS

## COUNT I
### Negligence against All Defendants

78. The Plaintiff reallege the allegations contained in the foregoing paragraphs and incorporate those

allegations by reference as if fully restated herein.

79. All Defendants negligently performed their job duties to deceive, manipulate, harass, and

intimidate on behalf of CSR.

80. All Defendants had a duty to exercise the applicable standard of care and/or deliver a service to

their colleagues, partners, and shelter families that were free from intimidation, hostility,

harassment, and bullying, and each breached its duty.  These Negligent acts were committed by the following individuals Defendants CSR (Joan, Natasha, and Carline):

81. At all relevant times including on May 11, 2021, Defendants CSR (Sandra, Joan, and Natasha) currently have in place a write up system within their corrective action performance improvement plans (PIP), same day termination was excessive and unnecessary since I confirmed that my current CSR personnel file had no existing complaints or warnings (without blemish) regarding my work performance.

82. At all relevant times including on May 11, 2021, Defendants Joan and Natasha retaliated and terminated me after I emailed Realtor Shantea Mac's 26-page complaint to Natasha Director of Human Resources.

83. At all relevant times including on May 11, 2021, Defendant Joan impeded on my required duty to communicate all serious incident reports to DHCD.

84. At all relevant times including on May 11, 2021, Defendant Joan orchestrated, partook, and fostered a hostile, contentious work environment that directly caused me to be bullied by colleague Carline Leon.

85. At all relevant times including on May 11, 2021, Defendants Natasha and Joan used intimidation when she presented the following two options (with only a few hours to decide by 5pm).  I could either resign voluntarily or receive a separation of employment from Human Resource.  I was reassured that with either option CSR would not contest unemployment.  Additionally, the pair also reiterated to me that I could not apply for nor accept future employment with the Police nor the Federal government.

86. At all relevant times including on May 11, 2021, Defendant Carline had a vendetta as she worked under the pretense that her Stabilization department was negatively impacted by the successful move-outs of (my department) Scattered Sites shelter families to permanent housing.

87. The Plaintiff have incurred and will continue to suffer damage including but not limited to physical/mental harm as a direct and proximate result of such breaches. Also, denial of future employment with the Police and the Federal government.

88. All Defendants are liable to Plaintiff for all damage including but not limited to physical and mental caused by such breaches.

89. WHEREFORE, the Plaintiff pray that, after trial, a judgment be entered in their favor and against all defendants jointly and severally, and that damages be awarded to the plaintiffs in an amount to be determined at trial plus interest, and costs.

## COUNT II
### Negligent Infliction of Emotional Distress against All Defendants

90. The Plaintiff repeat and re-allege the preceding paragraphs of this Complaint and incorporate same herein.

91. Defendants, Children's Services of Roxbury, its employees, agents owed a duty of care to the Plaintiff under the circumstances existing.

92. Defendants, Children's Services of Roxbury, its employees, agents breached that duty of care through its negligent conduct.

93. The Plaintiff suffered severe emotional distress and physical harm due to the Defendant's negligence.

94. WHEREFORE, the Plaintiffs demand judgment and damages against the Defendants, Children's Services of Roxbury, its employees, agents, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs.

## COUNT III
**Breach of Implied Warranties against All Defendants**

95. The Plaintiff realleage the allegations contained in the foregoing paragraphs and incorporate those allegations by reference as if fully restated herein.

96. All Defendants made express and/or implied warranties, but each breached its warranties and as a direct and proximate result Plaintiff has incurred and will continue to incur damage including but not limited to loss of consortium, loss of current/future employment, loss of wages, as well as negligent infliction of emotional distress (PTSD, anxiety, and depression).

97. All Defendants are each liable to Plaintiff for all damage including but not limited to physical and mental damage caused by such breaches.

98. WHEREFORE, the Plaintiff pray that, after trial, a judgment be entered in her favor and against Defendants, jointly and severally, and that damages be awarded to the Plaintiff in an amount to be determined at trial plus interest and costs.

## COUNT IV
**Breach of Implied Covenant of Good Faith and Fair Dealing against All defendants except Sandra McCroom**

99. The Plaintiff repeat and re-allege the preceding paragraphs of this Complaint and incorporate the same herein.

100. The **Implied Covenant of Good Faith and Fair Dealing** exception is recognized in MA and usually says that in certain situations employers can only dismiss employees for just cause or that they cannot dismiss employees for reasons motivated by malice or made in bad faith. This exception applies to my case when:

101. All Defendants (except Sandra McCroom) breached its implied covenant of good faith and fair dealing and as a direct and proximate result Plaintiff has incurred and will continue to incur damage including but not limited to loss of consortium, loss of current/future employment,

loss of wages, as well as negligent infliction of emotional distress (PTSD, anxiety, and depression).

102.    Defendants CSR (Sandra, Joan, and Natasha) breached this duty of care as currently they have in place a write up system within their corrective action performance improvement plans (PIP), same day termination was excessive and unnecessary since I confirmed that my current CSR personnel file had no existing complaints or warnings (without blemish) regarding my work performance.

103.    Defendants Joan and Natasha did breach said current duty of care as they retaliated and terminated me after I emailed Realtor Shantea Mac's 26-page complaint to Natasha Director of Human Resources.

104.    Defendant Joan did breach said duty of care when she impeded on my required duty to communicate all serious incident reports to DHCD.

105.    Defendant Joan did breach said duty when she orchestrated, partook, and fostered a hostile, contentious work environment that directly caused me to be bullied by colleague Carline Leon.

106.    Defendants Natasha and Joan did breach said duty of care when they used intimidation when presented the following two options (with only a few hours to decide by 5pm). I could either resign voluntarily or receive a separation of employment from Human Resource. I was reassured that with either option CSR would not contest unemployment. Additionally, the pair tried to further diminish my career when they reiterated that I could not apply for nor accept future employment with the Police nor the Federal government.

107.    Defendant Carline did breach said duty of care when she had a vendetta and worked under the pretense that her Stabilization department was negatively impacted by the successful move-outs of (my department) Scattered Sites shelter families to permanent housing.

108.    All Defendants are each liable to Plaintiff for all damage including but not limited to physical and mental damage caused by such breaches.

109.    WHEREFORE, the Plaintiff pray that, after trial, a judgment be entered in her favor and against Defendants, jointly and severally, and that damages be awarded to the Plaintiff in an amount to be determined at trial plus interest and costs.

## COUNT V
### Loss of Consortium against All Defendants

110.    The Plaintiff repeat and re-allege the preceding paragraphs of this Complaint and incorporate the same herein.

111.    That as the result of the negligence of the Defendant, Children's Services of Roxbury, its employees, agents and for those whose actions it is responsible for, the Plaintiff, Lorraine Trowers-Bell, as a married woman, suffered a loss of society and companionship with her husband.

112.    WHEREFORE, the Plaintiff, Lorraine Trowers-Bell demands judgment and damages against the Defendant, Children's Services of Roxbury, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs.

### REQUEST FOR RELIEF

113.    **Compensatory damages**: I am requesting pay for out-of-pocket expenses caused by the discrimination (such as costs associated with a job search or medical expenses). I would also like to be compensated for the emotional harm suffered (such as embarrassment & humiliation, mental anguish, inconvenience, as well loss of enjoyment of life).

20

114.      **Economic damages**: the repayment of lost wages, back pay is the amount of money that you lost because you were wrongfully fired; calculated from the date that you were wrongfully terminated until the time of trial.  Front pay: the time between the court judgment and when they are reinstated at work.  If they are not offered reinstatement, then a front pay award may be offered instead.

115.      **Punitive damages**: I request Punitive damages because CSR committed an especially malicious or reckless act of discrimination. I am Requesting the EEOC standard limit of $300,000 on the amount of compensatory and punitive damages due to the fact the CSR has more than 500 employees.

116.      **Liquidated damages**: This case has proof of intentional as well as malicious and reckless acts of discrimination.  I would like to be awarded the amount of back pay and benefits equivalent to what I would have received if I was not denied this position.

### Multiple Witnesses who can Support my Claim:

**Children's Services of Roxbury current and former employees:**

> Shari Gold Director of Congregate 857-492-5507 sgold@csrox.org
> Aaron Tavares Workforce Development Manager 857-492-6938 atavres@csrox.org
> Ernest Smither Director of Property Management 617-952-8039 esmither@csrox.org
> Kodjo Agblekpe former Case & Placement Manager 617-372-3084 agblekpe@gmail.com
> Ingrid Dautruche former Case & Placement Manager 774-327-4460 idautruche1@gmail.com
> Jemina Simon Case & Placement Manager jsimon@csrox.org
> Isabel Diaz Case & Placement Manager idiaz@csrox.org
> Yvette Harriott Case & Placement Manager yharriott@csrox.org

**Realtor Shantea Mac**- the person that I forwarded her complaint discrimination against CSR may be contacted at macshantea@gmail.com and 857-300-8986.

**Department of Housing and Community Development Contacts:**

> Danny Garcia 857-286-9882 danny.garcia@state.ma.us
> Annette Jackson 857-276-7733 annette.jackson@state.ma.us
> Perene Rice 857-329-9321 perene.rice@state.ma.us
> Bertram Williamson 617-512-8056 bertram.williamson@state.ma.us
> Barbara Duffy Barbara.j.duffy@state.ma.us
> Donna Nadeau Shelter Contract Manager 508-736-1616 donna.nadeau@state.ma.us

**Department of Transitional Assistance Contact:**

> Avalon Meyers
> Domestic Violence Specialist
> Avalon.meyers@state.ma.us
> 617-249-8140 Office
> 617-447-3986 Work Cell

**PLAINTIFF DEMAND A BENCH TRIAL AS TO ALL CLAIMS SO TRIABLE**

By Pro Se Litigant,

_____

MRS.  LORRAINE TROWERS-BELL
990 River Street #3
Boston, MA 02136
(617) 959-6400
ltrowers@yahoo.com

Date:   August 3, 2021