FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2022 MAY 23 PM 3: 05

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| **LORRAINE TROWERS-BELL,** )<br>Plaintiff, )<br>v. )<br> )<br>**CHILDREN'S SERVICES** )<br>**OF ROXBURY/Sandra McCroom** )<br>**JOAN SINNER** )<br>**NATASHA HALL** )<br>**CARLINE LEON** )<br>**Defendants et al.** ) | **CIVIL ACTION NO.**<br>**1:21-cv-11263-AK** |

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

This is a civil action for damages sustained by former Director of Scattered Sites Emergency Shelter at Children's Services of Roxbury Lorraine Trowers-Bell.

## PARTIES

1. The Plaintiff, Lorraine Trowers-Bell, (hereinafter "Plaintiff Trowers") is a naturalized citizen whose usual place of residence is Boston, Massachusetts. Plaintiff Trowers is an Caribbean/Jamaican female born in Kingston, Jamaica.

2. The Defendant, The Children's Services of Roxbury, (hereinafter "CSR") is a community-based, multiservice private child welfare agency, which provides emergency shelter in Congregate and Scattered site housing settings to families experiencing homelessness while assisting them in their search for permanent or transitional housing. CSR is a Massachusetts corporation with its usual place of business being 520 Dudley Street, Boston, Massachusetts.

3. The Defendant, Sandra McCroom, (hereinafter "McCroom") President and Chief Executive Officer by default is notified of this lawsuit, is an individual residing in Boston, Massachusetts. **Pursuant to MGL Chapter 151B section 4,** Defendant McCroom is liable as an agent of CSR.

4. The Defendant, Joan Sinner, American descent (hereinafter "Defendant Sinner") Vice President of Housing & Stabilization at CSR, is an individual residing in Boston, Massachusetts. **Pursuant to MGL Chapter 151B section 4,** Defendant Sinner is liable as an agent of CSR.

5. The Defendant, Natasha Hall, American descent (hereinafter "Defendant Hall") Director of Human Resources at CSR, is an individual residing in Boston, Massachusetts. **Pursuant to MGL Chapter 151B section 4,** Defendant Hall is liable as an agent of CSR.

1

6. The Defendant, Carline Leon, Haitian descent (hereinafter "Defendant Leon") Housing & Stabilization Program Manager at CSR, is an individual residing in Boston, Massachusetts. **Pursuant to MGL Chapter 151B section 4,** Defendant Leon is liable as an agent of CSR.

## BASIS FOR JURISDICTION AND CAUSE OF ACTION

7. Plaintiff Trowers' basis for federal court jurisdiction is a **federal question** under **Title VII of the Civil Rights Act of 1964 28 U.S.C. Section 1331,** which prohibits disparate treatment in terms and conditions of employment based on **race, color, religion, sex, and national origin**.

8. Under **28 U.S.C. section 1331,** the Defendant **intentionally discriminated** against Plaintiff Trowers based on her National Origin. Plaintiff Trowers' National Origin is an Caribbean/Jamaican female born in Kingston, Jamaica.

9. In addition to Plaintiff Trowers federal claim listed above, other claims are asserted under: **Massachusetts General Law Chapter 151B Section 4 states that it shall be an unlawful practice:**
   > **For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, pregnancy or a condition related to said pregnancy including, but not limited to, lactation or the need to express breast milk for a nursing child, ancestry or status as a veteran of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.**

## FACTS

10. Plaintiff Trowers was hired to work at CSR in 2017 as the emergency shelter's Director of Scattered Sites.

11. Plaintiff Trowers alleges claims under **28 U.S.C. section 1331, Title VII, and the M.G.L Chapter 151B Section 4** that defendant discriminated against her based on her national origin when she was terminated from CSR on May 11, 2021, and until the events of this case, had an excellent work and attendance history. Additionally, Plaintiff Trowers alleges claims under **Title VII and the M.G.L Chapter 151B Section 4** that defendant retaliated against her by terminating her employment after she emailed the twenty-six page complaint (Real Estate partner of Asian descent) alleging misconduct by CSR leaders and staff.

12. Emergency shelter is contracted and governed by Department of Housing and Community Development (hereinafter "DHCD") and CSR rules state that both (Scattered Site and Congregate) **shelter Directors and staff are mandated to regularly report serious incidents (within 24 hours of its occurrence in our shelter) to DHCD.** Along with submission of these serious incidents, DHCD also wanted shelter providers to supply police reports, pictures, and videos (when available) as supporting documentation. DHCD mandated and held each CSR

2

leader and staff accountable and liable to read and sign off on the requirement to identify, understand, and report every serious incident that occurred at CSR.

13. DHCD Contracting agencies expect shelter staff to work with a level of integrity and transparency. DHCD expects CSR Directors and staff interacting with their shelter families to be truthful in their statements and actions while in a professional capacity working under DHCD at CSR. Along with DHCD, CSR and housing authorities in Massachusetts' requirement for CSR shelter staff providers to maintain and verify these client documents, DHCD and CSR also expect a level of integrity and transparency. DHCD and CSR expects me to be truthful in my statements and actions while in a professional capacity at CSR.

14. Defendant Sinner was not in agreement with the DHCD and CSR rules and regulations and questioned and did not realize the types of efforts it would take for shelter families to become stable and rehoused. Also, to remain compliant with DHCD and CSR rules and regulations defendant Sinner did not realize that CSR shelter staff being "Essential Workers" needed a hybrid vs an entirely remote work schedule during peaks times of COVID-19. **Please see DHCD and CSR rules and regulations attached**. Plaintiff Trowers refused, and defendants Sinner and Leon became hostile and aggressively harassed her and her team's vigorous efforts to work expeditiously to permanently house homeless families.

15. Defendant Sinner admitted that she does not respect the process, nor does she understand the essence of housing homeless families. Defendant Sinner asked Plaintiff Trowers the reason housing authorities requested bank statements from our shelter families. Defendant Sinner commented to me that she did not agree with the fact that housing authorities require applicants to submit financial documentation to fulfill housing requirements i.e., bank statements and paystubs. Plaintiff Trowers advised defendant Sinner that this standard requirement was used by the Department of Housing and Urban Development (HUD) to access the families' financial need which is authorized to collect this documentation to determine eligibility and need.

16. However, Defendant Sinner opposed and questioned the need for Plaintiff Trowers and her housing staff to request and verify these client documents. Therefore, CSR and DHCD employees as well as shelter families can attest that during Plaintiff Trowers' tenure she delivered a strategic impactful leadership, which increased permanent housing placements that improved the reputation of CSR as well as the entire emergency shelter system governed by DHCD.

17. In a supervision meeting, Defendant Sinner made the following statements: "What is your rush, to return to the office?" We do not have to answer to DHCD." "Don't take into consideration CSR's liability, when we run (operate) our programs?"

18. DHCD and CSR rule state that upon move-in (to CSR) shelter families are mandated to complete a 20-mile form, which certifies that the family has opted to accept and (when a suitable shelter placement becomes available) return to a shelter placement closer to their hometown when DHCD notifies the shelter provider (CSR) that the shelter placement has becomes available. Based on DHCD protocol, the shelter family was contacted and notified of

3

the approved request and that they were now authorized to move back to an emergency shelter in their hometown of Brockton, MA.

19. In a supervision meeting, Defendant Sinner stated that Plaintiff Trowers was a lying conniving deceptive person who did not care about shelter families because a shelter family called her upset and crying as they did not desire to relocate to their hometown of Brockton. In actuality, the shelter family did not remember that (upon move-in) they submitted this 20-mile request to return to Brockton. Defendant Sinner never apologized and dismissed the fact that **shelter Directors are obligated under DHCD rules to communicate and coordinate these mandated approved transfers with DHCD and CSR shelter families.**

20. In January to March 2021, a shelter family submitted a request to cultivate and grow marijuana in the scattered site shelter unit without the landlord's consent. Defendant Sinner wanted Plaintiff Trowers to approve client's request and bypass submitting the request to DHCD. When the notice was submitted, DHCD denied the request. **Defendant Sinner expected Plaintiff Trowers to approve client's request without submitting the official request to DHCD. Defendant Sinner also expected Plaintiff Trowers to violate DHCD and CSR drug and smoke free policies (pg. 23-24) that prohibit drugs and smoking on CSR and DHCD property.**

21. DHCD protocol mandates that Plaintiff Trowers (role as a shelter Director) has always been to submit all serious incidents to DHCD as well as to get consent from the landlord regarding the growth of a controlled substance on their property. This case was no different for Defendant Sinner to oppose submission of (DHCD mandated shelter forms) the serious incident and police reports, but once Plaintiff Trowers submitted these serious incident and police reports, they were indeed denied by DHCD. **Defendants Sinner and Hall also terminated the Case Manager Kodjo Agblekpe (African descent) on 5/12/2021 (the day after Plaintiff Trowers was fired).**

22. On 1/12/2021, an unexplained and sudden death occurred on 1/1/2021 within the scattered site shelter unit where there was illicit drug use in the presence of the shelter families' minor child. The result was an unexplained and sudden death of an unauthorized guest who overdosed using these illicit drugs. **Instead, defendant Sinner obtained the police report on her own, allowed Plaintiff Trowers to view it but warned her not to obtain the police report as a shelter Director nor should she submit the police report (as mandated) to DHCD.**

23. Regarding this matter, Plaintiff Trowers discovered that this shelter family failed to report this incident and tried to cover up the facts to obstruct her ongoing Department of Children and Families (DCF) case. Defendant Sinner was more concerned that this family called her in tears to complain that Plaintiff Trowers asked her too many questions and stated that she was unable to predict the manner and how soon DHCD would resolve the outcome of death and illicit drug use within their shelter unit. This case was no different for Defendant Sinner to oppose mandated reporting to DCF as well as submission of (DHCD mandated shelter forms) the serious incident and police reports, but once Plaintiff Trowers submitted these serious incident and police reports, DHCD could have record of the incident.

24. On 3/2/2021, a shelter family with a history of domestic violence disclosed her current housing location to her past abuser. This case was no different for Defendant Sinner to oppose submission of (DHCD mandated shelter forms) the serious incident and police reports, but once Plaintiff Trowers submitted these serious incident and police reports, DHCD could have record of the incident and relocate the family for their safety.

25. On 3/10/2021, a shelter family had a violent fight with their guests in their unit at 2:00AM which led to a guest being stabbed (with a large knife) and transported to hospital. **DHCD and CSR rules (pg. 22) prohibit all shelter families to possess any weapon on shelter property**. This case was no different for defendant Sinner to oppose submission of (DHCD mandated shelter forms) the serious incident and police reports, but once Plaintiff Trowers submitted these serious incident and police reports, DHCD could have record of the incident and relocate the family for their safety. **Defendants Sinner and Hall also terminated Case Manager Kodjo Agblekpe (African descent) on 5/12/2021 (day after Plaintiff Trowers was fired) which is a violation of Title VII and the M.G.L Chapter 151B Section 4.**

26. On 4/13/2021, a shelter family with a history of domestic violence allowed her abuser to visit her scattered site unit in Mattapan at 5:00 AM and access the clients' weapon/gun. **DHCD and CSR rules (pg. 22) prohibit all shelter families to possess any weapon on shelter property**. This family was previously transferred from our Co-shelter setting by CSR's Congregate Director (American descent) for a similar domestic violence incident by the same abuser. Defendant Sinner did not seem to hold it against that Congregate Director when she notified DHCD about that client's prior domestic violence incident. This shelter family placed CSR staff, other CSR shelter families, as well as the public at risk as she withheld and gave misleading statements to the **(Avalon Meyers; Domestic Violence Assessor at Department of Transitional Assistance-DTA)** when she allowed her abuser to visit her unit at 5am and access a gun the client had in her possession. **Defendants Sinner and Hall also terminated Case Manager Kodjo Agblekpe (African descent) on 5/12/2021 (day after Plaintiff Trowers was fired) which is a violation of Title VII and the M.G.L Chapter 151B Section 4.**

27. Regarding, CSR employees of (American descent) similarly situated with Plaintiff Trowers were treated differently. This Director currently employed at CSR was not terminated (for performing her normal job duties): Shari Gold (American descent): the CSR Director (American descent) of Congregate also previously emailed DHCD regarding the client (mentioned above who had the gun her unit) at the time she had a serious domestic violence incident in her unit. Once this Director notified DHCD, they decided to transfer the client to another emergency shelter. **Defendant Sinner did not decide to terminate this Director (American descent) that makes similar decisions as Plaintiff Trowers.**

28. In a supervision meeting, defendant Sinner also made the following harassing, intimidating, bullying, statements that depressed and caused me stress **Defendant Sinner told Plaintiff Trowers to hire Caucasian (White American descent) Clinicians as they would make better housing case managers.** She stated that Plaintiff Trowers was wrong to hire "so many" non-American/foreigners. **Defendant Sinner instructed Plaintiff Trowers to violate**

5

**CSR's Anti-Discrimination policy (pg. 24-25) to hire case Management staff based on their race. Unwittingly, Plaintiff Trowers made a qualified hire of a clinician (Haitian American descent).** WHEN PLAINTIFF TROWERS DID NOT HIRE A CLINICIAN WHO WAS CAUCASIAN (WHITE AMERICAN DESCENT), HER RELATIONSHIP WITH DEFENDANT SINNER SPIRALED AND THE WORK ENVIRONMENT WAS MORE HOSTILE AND STRESSFUL.

29. Plaintiff Trowers presented defendant Sinner with proof that CSR staff L. Johnson (American descent) submitted fraudulent mileage requests. Defendant Sinner responded that the CSR staff's actions were insignificant and did not warrant a corrective action (write up) as L. Johnson indeed submitted multiple fraudulent requests but based on the dates (end of Dec 2020 and beginning of Feb 2021) she only committed this fraud once in the year. **CSR's Code of Conduct (pg. 21-22) state that employees who engage in theft and falsification or misrepresentation of material information are terminated. In the past, former CSR Property Manager Rosa (Hispanic descent) was automatically terminated for theft.**

30. Plaintiff Trowers spoke with defendants Sinner and Hall regarding CSR staff W. Dinkins (American descent) utilization of her personal computer to conduct CSR business. W. Dinkins is currently still employed at CSR, although she thwarted every effort to resolve the issue with the IT department and continues to use her personal computer to conduct privileged CSR for shelter families. **CSR's Computer Use policy (pg. 33-34) state that CSR computer are reserved for business use.**

31. Plaintiff Trowers presented defendant Sinner with proof that during a supervision meeting CSR staff C. Smalls (American descent) made verbal and intimidating threats to Plaintiff Trowers. Plaintiff Trowers called defendant Sinner immediately to report the assault and defendant Sinner undermined the incident and stated that I did not clearly communicate to her that this violent and threatening encounter with Case Manager C. Smalls left me fearful and vulnerable. Defendant Sinner stated that C. Smalls' actions did not warrant a follow up meeting nor a corrective action (write up) as the incident was no longer imminent, and I failed to convey the seriousness of the alleged threat. **CSR's policy against Workplace Violence (pg. 27-28) states that employees may not make verbal or physical threats to CSR staff, partners, clientele. In the past, former case manager E. DeCarvalho (Cape Verdean descent) received a write up for making threatening statements to a CSR staff.**

32. Additionally, it has been confirmed that current and former CSR employees of American descent (C. Smalls, W. Dinkins, L. Johnson, A. Parker, R. Dorsey, C. House, L. McClorin and S. Jones) all have complaints on file by CSR staff, shelter families, as well as CSR partners regarding their work performance. However, these CSR employees (American descent) were written up for their multiple infractions but were not terminated from CSR. **However, Plaintiff Trowers (Caribbean/Jamaican descent) and Kodjo Agblekpe (African descent) who have employment files without complaints were terminated (on the spot) without warning.**

33. Currently, employed as CSR's Security Guard is Cedric Earl House (American descent) who has a recent arrest record online (less than 10 years old) dated 4/26/2013. **CSR Criminal Offender Record Information (CORI) policy (pg. 18) are strict for arrest records less**

6

**than 10 years old and are pursuant to an agency with Early Education and Care (EEC) licensed programs and DCF reviews which include fingerprint checks.**

34. In 2020, at CSR's yearly all staff assembly meeting in Worcester, MA, defendant Sinner deliberately humiliated Plaintiff Trowers publicly when she was asked to give a presentation on behalf of the Housing & Stabilization department. Defendant Sinner asked that she present on the department's highlights. The day before the event defendant Sinner rewrote her entire speech and deleted Plaintiff Trowers' input (making it more difficult to memorize). Plaintiff Trowers informed defendant Sinner that she is extremely nervous when speaking to audiences as she has a speech impediment disability of stuttering, so Plaintiff Trowers asked that defendant Sinner please assign this task to someone else. Although another CSR staff (A. Tavares) agreed to deliver the speech, defendant Sinner declined his offer. Instead, defendant Sinner forced Plaintiff Trowers to deliver the presentation to a crowd of over two hundred people.

35. Defendant Sinner reiterated to Plaintiff Trowers that this was a task given to her and she must do as she was told. While speaking to the crowd, she almost fainted. She began sweating, the room seemed to be spinning, as her vision seemed blurred (things moved in slow motion), and her eyes were twitching (a sign that her nerves were irritated). Plaintiff Trowers was stuttering and skipping words which made her incoherent, so her leadership team had to assist her and take over the speech. The whispers, laughter, and snickering were inaudible, plaintiff Trowers could only see the crowds' lips moving. That experience left her feeling like a failure, embarrassed, ashamed, and humiliated. **CSR's Employee with Disabilities policy under the Americans with Disabilities Act (ADA) (pg. 30-31) support that Plaintiff Trowers would not be insubordinate if she declined to speak at this employee event as well as defendant Sinner to choose an alternate to speak instead of Plaintiff Trowers.**

36. Due to the extremely hostile and stressful work environment plaintiff Trowers considered taking time off for anxiety, stress, and depression.

37. In leadership meetings, Defendant Sinner would provoke Plaintiff Trowers when she addressed issues (publicly) that only they discussed. The leadership team would be able to ascertain that she was referring to Plaintiff Trowers as the issue was one that Directors would manage. This would urge me to address the issue while staff/leadership were present-so all staff always knew Defendant Sinner and Plaintiff Trowers not in agreement or incongruent.

38. In leadership meetings, Defendant Sinner would publicly belittle Plaintiff Trowers by mentioning things that did not go as planned for her. Defendant Sinner would state that this is an example that Plaintiff Trowers should not strive for perfection. Defendant Sinner stated that she liked when things went wrong for Plaintiff Trowers as that proved to her that it is all right not to expect perfection. Therefore, Plaintiff Trowers should not realistically thrive for perfection. These statements were not encouraging but instead made Plaintiff Trowers feel uncomfortable and seemed as if Defendant Sinner deliberately blocked the goals Plaintiff Trowers wanted to achieve at CSR.

39. Defendant Sinner intentionally fostered and encouraged the underlying harassment from colleague Defendant Leon who made unprofessional remarks to Plaintiff Trowers (publicly: in the presence of her Scattered Sites staff and leadership team) about her leadership and work ethic. Defendant Sinner fostered a hostile, toxic and stressful work environment when she allowed the Home BASE and Stabilization Manager Defendant Leon to make public contentious and damaging statements to Plaintiff Trowers in the presence of her peers that questioned her leadership skills and work ethic.

40. In a leadership meeting, Defendant Leon stated to Plaintiff Trowers that she did not properly/advocate for CSR shelter families, also that Plaintiff Trowers allegedly uses forceful tactics to move families out of shelter. Also, Defendant Leon stated that Plaintiff Trowers allowed shelter families not to view apartments before they signed their lease. Defendant Sinner neither addressed nor followed up with the meeting Plaintiff Trowers requested to resolve this matter.

41. During that leadership meeting, Plaintiff Trowers requested that they meet to discuss the issues Defendant Leon had with Plaintiff Trowers and her scattered sites housing staff as well as the open negative statements she continued to make regarding Plaintiff Trowers' work ethic and leadership skills. Defendant Sinner never followed up with her to schedule a meeting nor to address Defendant Leon's statements. Admittedly, Plaintiff Trowers did not follow up and attempt to schedule this meeting as she was very fearful of the "trouble she would create for herself" and the lack of support she would receive from Defendant Sinner.

42. During the event surrounding Realtor Shantea Mac's (Asian descent) twenty-six page emailed complaint, Defendant Leon stated that Plaintiff Trowers Scattered Sites housing team typically perform acts "not in the best interest" of CSR shelter families and Plaintiff Trowers condoned her Scattered Sites housing team to act on the behalf of shelter families without the families' consent. CSR staff Case Managers have witnessed Defendants Sinner and Leon's hostile, negative, harassing, and stressful statements that criticize Plaintiff Trowers' work ethic and leadership skills as a shelter director.

43. Plaintiff Trowers notified Defendant Sinner about Realtor Mac's allegations that Defendant Leon made hostile, harassing, combative statements about Plaintiff Trowers, CSR staff, CSR shelter families, as well as to CSR partners. Defendant Sinner did nothing about Plaintiff Trowers constant complaints about Defendant Leon's hostile and harassing and the effects defendant Leon's actions were having on the housing department. Defendant Sinner did not address these concerns with Plaintiff Trowers, defendant Leon nor the CSR shelter housing staff as a group. **CSR's Anti-Discrimination/Anti-Harassment policy (pg. 24-25) state Supervisors have a duty to address, resolve and follow-up with all (written/oral) complaints workplace harassment/bullying disputes.**

44. Defendant Hall stated to Plaintiff Trowers that despite her fears and anxiety she as the complainant was also responsible to follow-up regarding the meeting to be scheduled with Defendants Sinner and Leon. Defendant Hall asked Plaintiff Trowers if she believed Defendant Sinner would be upset at her once Defendant Hall contacted Defendant Sinner regarding the twenty-six page complaint Plaintiff Trowers forwarded to defendant hall in Human Resources.

8

45. Along with the statement that **Defendant Sinner told Plaintiff Trowers, to hire Caucasian (White American descent) Clinicians as they would make better housing case managers.** She stated that Plaintiff Trowers was wrong to hire "so many" non-American/foreigners. Coupled with this statement Defendant Sinner and Hall's termination seemed retaliatory since it took place eleven days after Plaintiff Trowers emailed Realtor Shantea Mac (Asian descent) complaint to Defendant Hall in Human Resources. **Please see Realtor Shantea Mac (Asian descent) twenty-six page complaint attached. CSR's Anti-Discrimination/Anti-Harassment policy (pg. 24-25) state CSR.** Therefore, Defendants Sinner and Halls' deliberate actions are in violation of **Title VII and the M.G.L Chapter 151B Section 4.**

46. Defendant Sinner intentionally fostered a hostile, contentious work environment that directly caused me to be bullied by colleague defendant Leon. Defendants Sinner and Hall terminated Plaintiff Trowers days after Plaintiff Trowers forwarded Realtor Shantea Mac's (Asian descent) email (attached twenty six page email) that listed chief complaints about interactions she had primarily with Defendant Leon Home BASE and Stabilization Manager. **CSR's Anti-Retaliation policy/Complaint procedure (pg. 29-30) state that violators are subject to discipline as well as termination. CSR conducts a direct and thorough investigation of the facts and circumstances.**

47. On 4/5/2021 Defendant Leon copied me on a disrespectful and contentious email between herself and Realtor Shantea Mac (Asian descent). Plaintiff Trowers also forwarded this email to her supervisor defendant Sinner for transparency and resolution. Defendant Sinner neither addressed nor met with Defendant Leon and Plaintiff Trowers regarding this email. Plaintiff Trowers also forwarded this email chain to defendant Sinner to ensure she was aware of the impending issue. Defendant Sinner did not respond to this email, nor did she follow up regarding the result of this email chain. **CSR's Code of Conduct guarantees CSR staff treat everyone with respect and prohibit staff from treating partners like they are an interruption of the work of an employee (pg. 21-22)**

48. On 4/12/2021 Realtor Shantea Mac (Asian descent) emailed her concerns about CSR to Plaintiff Trowers. Plaintiff Trowers forwarded Mrs. Mac's email to Defendant Sinner who neither addressed, met with Defendant Leon nor followed up with Plaintiff Trowers regarding Realtor Shantea Mac's (Asian descent) complaint email concerning unprofessional interactions with CSR staff. **CSR's Internal Complaint of Discrimination and Harassment policy (pg. 26-27 and pg. 30) ensure an investigation and follow-up with the complainant.**

49. On 4/15/2021 Pursuant to **CSR's Internal Complaint Procedure policy (pg. 26-27 and pg. 30)** Plaintiff Trowers followed protocol when she notified defendants Sinner and Hall in Human Resources, when she spoke with them (respectively) she forwarded the email that CSR indeed owed Mrs. Mac money for services rendered, that CSR's reputation was at stake and time was of the essence before Realtor Shantea Mac (Asian descent) went public with the damaging information against CSR.

50. Therefore, Plaintiff Trowers believed that Defendant Sinner may need assistance with this matter as in the past she demonstrated the inability to confront oppositional behavior among CSR staff. Defendant Sinner was employed at CSR (for two years) since 2019. Also, Plaintiff Trowers career and reputation were also at stake (as a leader in Housing & Stabilization) so Plaintiff Trowers believed forwarding the email would give her support to manage the matter appropriately.

51. On Tuesday May 11, 2021, (in a single meeting-on the spot with only Defendants Sinner and Hall), the following unlawful, unfair, and deceptive acts and or allegations occurred without any prior verbal nor written warnings noted on Plaintiff Trowers employment file. Also, without any gross misconduct threats or violence toward CSR staff nor CSR families. **CSR's Internal Complaints of Discrimination/Harassment policy (pg. 26-27) state for an in depth investigation, fairness, and equity, is conducted to include CEO Sandra McCroom, witnesses, evidence, and if needed Massachusetts Commission Against Discrimination (MCAD) and Equal Employment Opportunity Commission (EEOC) before a final decision of termination. Therefore, Defendants Sinner and Halls' deliberate actions are in violation of Title VII and the M.G.L Chapter 151B Section 4.**

52. In this meeting, Defendants Sinner and Hall also warned that this termination from CSR would prevent Plaintiff Trowers from future employment with State/Federal entities as well as law enforcement. Defendant Sinner and Hall did not explain the justification for such serious employment restrictions that has an unnecessary adverse effect on Plaintiff Trowers' career in the Human Service field of Affordable Housing field, which directly connects to State/Federal entities as well as law enforcement. **CSR's Re-employment policy (pg. 53-54) prohibits reemployment if based on Discrimination and Retaliation).**

53. Plaintiff Trowers termination letter stated a vague and broad reason for termination (without witnesses or evidence) from CSR was "**interactions have a negative impact on staff and families.**" **Based on the facts, defendant Sinner had an ulterior motive to terminate Plaintiff Trowers (Caribbean/Jamaican descent) to hire a Caucasian clinician (White American descent) as a Scattered Sites Director. This is in violation of Title VII and the M.G.L Chapter 151B Section 4.**

54. This statement "**interactions have a negative impact on staff and families**" cannot be more far from the truth. In Plaintiff Trowers' first year at CSR, she was able to re-house families who were living in CSR shelter for six years. During her tenure at CSR, not only did she equip her housing team to increase permanent housing placements she also created systems and documents to make the re-housing process at CSR more effective and efficient. Therefore, it was unfair and wrongful to abruptly terminate Plaintiff Trowers and tarnish the career of someone who positively impacted the entire Massachusetts shelter housing system. **CSR's Disciplinary Procedures policy (pg. 22) state CSR reserves the right not to follow its disciplinary measures as it is deemed appropriate under the circumstances.** Therefore, CSR must explain how the above broad and vague statement could lead to such stringent termination and rehiring measures. Also, explain why Plaintiff Trowers could not exercise her rights under the CSR grievance procedure since she stated that she was being disciplined (termination) unjustly.

55. In May 2021 (during the Pandemic, the same month that she was terminated), Plaintiff Trowers and CSR case management housing team were in the process of assisting shelter families to complete housing applications and submit documentation for two major housing initiatives. The first was for shelter families impacted by domestic violence under the Victims Against Women Act (VAWA) and the second was for families impacted by a long-term chronic illness. About sixty of CSR's 120 families in scattered sites were able to submit applications to obtain suitable affordable housing for homeless families.

56. Since Plaintiff Trowers' departure, Defendant Sinner has since updated the Scattered Sites Director job description. However, Plaintiff Trowers personnel file no longer has the initial job description included. The initial job description stated that shelter Providers that oversee DHCD Emergency Shelters must equally report to their contractor (DHCD) as well as CSR. **Please see past job descriptions which include DHCD duties.**

57. CSR currently has in place a corrective action (write-up system) performance improvement plans (PIP), however, Plaintiff Trowers' current employee record has no verbal nor written corrective action plan. Plaintiff Trowers personnel file had no reprimands or existing complaints or warnings regarding her work performance. **CSR's Disciplinary Procedures policy (pg. 22) state disciplinary measures include verbal, written, performance plan, then discharge.**

58. Defendant Sinner created, fostered, a hostile, harassing work environment at CSR. The actions of Defendants Sinner and Hall were unethical, unfair, and deceptive as Plaintiff Trowers was only given a verbal termination. Both Supervisors; Defendants Sinner and Hall retaliated against Plaintiff Trowers when they fired her eleven days after receipt of Realtor Mac's emailed complaint on CSR work practices Also, Defendant Sinner caused and fostered a hostile and harassing work environment when Plaintiff Trowers hired qualified (non-American/foreigners) housing case managers. WHEN PLAINTIFF TROWERS EMAILED REALTOR MAC'S TWENTY-SIX PAGE COMPLAINT ON CSR MISCONDUCT, HER RELATIONSHIP WITH DEFENDANT SINNER SPIRALED AND THE WORK ENVIRONMENT WAS MORE HOSTILE AND STRESSFUL.

59. After being praised by DHCD and CSR for steadily increasing permanent housing placements for homeless families at CSR, Plaintiff Trowers was fired on the spot; without any prior verbal nor written warnings noted on my work record. Defendant Sinner had an ulterior motive to replace Plaintiff Trowers (Caribbean/Jamaican) with a Caucasian (White American) Director. Defendant Sinner could offer no first-hand account of evidence of my alleged egregious behavior that warrant being fired on the spot with an employee file (w/o verbal or written warnings). Therefore, Defendant Sinner deliberate actions are in violation of **Title VII and the M.G.L Chapter 151B Section 4.**

60. Plaintiff Trowers asked that Defendant Sinner produce her accusers, (staff as well as CSR participants) that Defendant Sinner stated as the cause of her termination. Defendant Sinner produced no one and dismissed Plaintiff Trowers' request. Furthermore, Defendants Sinner and Hall presented bogus one-sided arguments and never produced Plaintiff Trowers alleged

accusers (CSR shelter families and staff) nor hear their specific statements/concerns and view evidence about her alleged intolerable actions.

61. Defendant Sinner met with Scattered Sites case management housing staff on the morning of May 12th to officially announce Plaintiff Trowers alleged "voluntary" departure and Defendant Sinner communicated that Plaintiff Trowers was "sick" (this was untrue, Defendant Sinner fired Plaintiff Trowers on 5/11/2021) and unable to return to work. Defendant Sinner also threatened that the scattered sites housing staff refrain from contact with Plaintiff Trowers.

62. On May 12th, 2021, it was brought to Plaintiff Trowers attention (following her termination) that Kodjo Agblekpe (African descent) was suspended without pay. He was the Case Manager for the above listed cases (except one). He may have been targeted as he was newly hired, a non-American/foreigner and the prime witness on these cases who always assisted with gathering concrete evidence that could be strengthening these serious incidents.

63. Defendants Sinner and Hall breached their professional duty of care owed to Plaintiff Trowers to objectively review the complaint document that made allegations about and could damage CSR's human service reputation. Therefore, Plaintiff Trowers was terminated without any gross misconduct, threats or violence toward CSR staff or shelter families. Again, Defendant **Sinner had an ulterior motive to terminate Plaintiff Trowers to replace her with a White Director with a Clinical background**. Defendant Sinner was upset that Plaintiff Trowers hired "so many" non-American/foreigners. This action is in violation of **Title VII and the M.G.L Chapter 151B Section 4.**

64. Defendants Sinner and Hall used intimidation and manipulation when they presented the following two options (with only hours to decide by 5pm). Option 1: Plaintiff Trowers could either resign voluntarily or Option 2: receive a separation of employment from defendant Hall. Plaintiff Trowers believes and has communicated that this termination is unjust, so was unable to choose either option. **CSR Unemployment Insurance (UI) and Separation of Employment policies (pg. 64 and 70) are silent on UI state law that If employees were fired for deliberate misconduct relating to the job, they are disqualified from receiving UI benefits. Therefore, it seems willful, unfair, and deceptive that defendants Sinner and Hall can use UI benefits as a bargaining tool to terminate Plaintiff Trowers. Coupled with the fact that this act contradicts the vague and broad statement that Plaintiff Trowers' termination is based on "interactions have a negative impact on staff and families."**

65. Plaintiff Trowers was reassured that with either option CSR would not contest unemployment insurance benefits. However, based on her alleged "negative work history at CSR," **Plaintiff Trowers must forfeit future employment with the Police or State/Federal government. Neither defendants Sinner nor Hall could offer any explanation on how "this punishment fit, her crime."**

66. Defendants Sinner and Hall left Plaintiff Trowers with no choice but to contest this wrongful termination. They believed that Plaintiff Trowers should end her career of housing homeless families with the degradation that she was fired from CSR. Plaintiff Trowers human

service work was made possible and has a direct nexus to the Police and the Federal government.

67. Defendants Sinner and Hall also committed a HIPAA violation of medical privacy when that stated that Plaintiff Trowers did not take the COVID-19 vaccine and she was not in support of the agency mission and vision. Also, she believed that the state of her health was questioned, and she was treated adversely because at the time she was not vaccinated.

68. Defendant Hall impeded Plaintiff Trowers' to perform her job duties as a Scattered Site Director when she directed her not to write honest statements regarding the last two employees that departed with CSR. Defendant Hall instructed Plaintiff Trowers to resubmit the reason CSR should not rehire these two employees who voluntarily resigned from CSR.

69. Essentially, Plaintiff Trowers performed her job duties adequately when she promptly presented all COVID-19 information regularly at meetings with CSR housing staff which then equipped her case managers to relay this information to shelter families.

70. Defendant Sinner wanted Plaintiff Trowers to push/force families and staff to take and track who had been vaccinated. This new role was not in Plaintiff Trowers' job description, nor is she equipped with medical education/licenses required to give medical advice to CSR staff nor shelter families on matters related to health and medicine.

71. As a result, based on the foregoing information Plaintiff Trowers is entitled to judgment as a matter of law on plaintiff's claims of discrimination based on national origin under **28 U.S.C. section 1331, Title VII, and the M.G.L Chapter 151B Section 4** and plaintiff's claims of discrimination based on retaliation under **Title VII and the M.G.L Chapter 151B Section 4**.

## COUNT I
### (National Origin)

72. Plaintiff Trowers incorporates by reference the allegations contained in paragraphs 1-65 of the complaint.
73. Plaintiff Trowers believes and therefore avers that her termination was not based on legitimate business considerations but because of her national origin.
74. Plaintiff Trowers believes and therefore avers that she was subject to a hostile work environment, including, but not limited to, disparate treatment in terms of discipline, based on her national origin.

WHEREFORE, the Plaintiff demand judgment and damages against the Defendants, Children's Services of Roxbury, its employees, agents, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs:

A. That the Court enjoin the Defendants from continuing their unlawful practices in violation of **Title VII and M.G.L. 151(B).**
B. That damages be assessed against the Defendants for emotional stress suffered because of the unlawful practices of the defendant.

C. That the Defendants be ordered to pay the Plaintiff all reasonable attorney's fees plus costs of this action in accordance with **Title VII and M.G.L. 151(B)**.
D. That the Court grants the Plaintiff such other relief as may be just and proper.

## COUNT II
### (Retaliation)

75. Plaintiff Trowers incorporates by reference that allegations contained in paragraphs 1 through 65 of the complaint.
76. Plaintiff Trowers believes and therefore avers that her termination was not based on any legitimate business considerations but because she forwarded Realtor Shantea Mac's emailed complaint to defendants Sinner and Hall regarding the hostile work environment that Realtor Mac was subject to. Coincidentally, Realtor Shantea Macs' twenty-six page complaint corroborates and fortifies Plaintiff's Trowers' allegations.

WHEREFORE, the Plaintiff demand judgment and damages against the Defendants, Children's Services of Roxbury, its employees, agents, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs:

A. That the Court enjoin the Defendants from continuing their unlawful practices in violation of **Title VII and M.G.L. 151(B)**.
B. That damages be assessed against the Defendants for emotional stress suffered because of the unlawful practices of the defendant.
C. That the Defendants be ordered to pay the Plaintiff all reasonable attorney's fees plus costs of this action in accordance with **Title VII and M.G.L. 151(B)**.
D. That the Court grants the Plaintiff such other relief as may be just and proper.

## COUNT III
### (Intentional Negligent Infliction of Emotional Distress against All Defendants)

77. Plaintiff Trowers incorporates by reference the allegations contained in paragraphs 1-65 of the complaint.
78. Plaintiff Trowers believes and therefore avers that her termination was not based on legitimate business considerations but because of the defendants' negligent and intentional actions.
79. Plaintiff Trowers believes and therefore avers that she was subject to a hostile work environment, including, but not limited to, disparate treatment in terms of discipline, based on agents' duty of care owed to the Plaintiff under the circumstances existing.
80. Plaintiff Trowers believes and therefore avers that she was subject to a hostile work environment, including, but not limited to, disparate treatment in terms of discipline, based on agents breached that duty of care through its negligent conduct.
81. Plaintiff Trowers believes there is considerable injury and future harm to **unnecessarily restrict employment ("black ball") in her specific fields of interest/careers with the police and in state and federal government**. Coincidently, since 5/11/2021 (termination)

Plaintiff Trowers has applied for about twenty jobs in her above stated careers fields but as of 11/11/2021 will mark 6 months of unemployment. Also, two job interviews where I was the finalist but never selected for the positions.

82. **Plaintiff Trowers suffered the following intentional short and long-term injuries:** Plaintiff Trowers was forced, at the peak of her career, to change career paths and rebuild from scratch. Plaintiff Trowers had to apply for SNAP food stamps and cash benefits with the Department of Transitional Assistance (DTA). After private healthcare expired, she was forced to apply for MassHealth. Also, had to change her longtime family dentist as their office did not take MassHealth. Due to extreme pressure form unemployment Plaintiff Trowers was hospitalized for seven days for anxiety, emotional stress, and depression. Plaintiff Trowers is now responsible for an absorbent amount of hospital bills that she must pay out-of-pocket. The loss of employment and financial resources has left a marital stress on her marriage.

WHEREFORE, the Plaintiffs demand judgment and damages against the Defendants, Children's Services of Roxbury, its employees, agents, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs:

A. That the Court enjoin the Defendants from continuing their unlawful practices in violation of **Title VII and M.G.L. 151(B).**
B. That damages be assessed against the Defendants for emotional stress suffered because of the unlawful practices of the defendant.
C. That the Defendants be ordered to pay the Plaintiff all reasonable attorney's fees plus costs of this action in accordance with **Title VII and M.G.L. 151(B).**
D. That the Court grants the Plaintiff such other relief as may be just and proper.

## COUNT IV
### (Loss of Consortium against All Defendants)

83. Plaintiff Trowers incorporates by reference the allegations contained in paragraphs 1-65 of the complaint.
84. Plaintiff Trowers believes and therefore avers that her termination was not based on legitimate business considerations but because of the defendants' negligent and intentional actions.
85. Plaintiff Trowers believes and therefore avers that she was subject to a hostile work environment, including, but not limited to, disparate treatment in terms of discipline, based on agents' duty of care owed to the Plaintiff under the circumstances existing.
86. Plaintiff Trowers believes that as the result of the negligence of the Defendant, Children's Services of Roxbury, its employees, agents and for those whose actions it is responsible for, the Plaintiff, Lorraine Trowers-Bell, as a married woman, suffered a loss of society and companionship with her husband. The loss of employment and financial resources has left a marital stress on her marriage.

WHEREFORE, the Plaintiff, Lorraine Trowers-Bell demands judgment and damages against the Defendant, Children's Services of Roxbury, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs:

A. That the Court enjoin the Defendants from continuing their unlawful practices in violation of **Title VII and M.G.L. 151(B).**
B. That damages be assessed against the Defendants for emotional stress suffered because of the unlawful practices of the defendant.
C. That the Defendants be ordered to pay the Plaintiff all reasonable attorney's fees plus costs of this action in accordance with **Title VII and M.G.L. 151(B).**
D. That the Court grants the Plaintiff such other relief as may be just and proper.

Lorraine Trowers-Bell
990 River Street #3
Boston, MA 02136
(617) 959-6400
ltrowers@yahoo.com

Date: May 23, 2022

